René P. Voss (CA Bar No. 255758)
Natural Resources Law
15 Alderney Road
San Anselmo, CA 94960
Phone: (415) 446-9027
Email: renepvoss@gmail.com
LEAD COUNSEL

Andrew Hursh (MT Bar No. 68127109)
Wilderness Watch
PO Box 9175
Missoula, MT 59807
Phone: (913) 660-6034
Email: andrewhursh@wildernesswatch.org
LEAD COUNSEL
*Applicant Pro Hac Vice*

*Attorneys for Plaintiffs*

UNITED STATES DISTRICT COURT

EASTERN DISTRICT OF CALIFORNIA

FRESNO DIVISION

WILDERNESS WATCH, SEQUOIA FORESTKEEPER, and TULE RIVER CONSERVANCY,

Plaintiffs,

v.

NATIONAL PARK SERVICE,

Defendant.

No.:

**COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF**

(Administrative Procedure Act, 5 U.S.C. §§ 701 *et seq.*)

**INTRODUCTION**

1. This is a civil action for declaratory and injunctive relief, which stems from Federal Defendant's (the National Park Service's) actions related to "Fuels Reduction Efforts to Protect Sequoia Groves in Sequoia and Kings Canyon National Parks from the Devastating Effects of High-Intensity Fire" (hereafter, the "Fuels Reduction Project" or "Project").

2. The National Park Service (NPS) authorized the "Fuels Reduction Project" through a decision memo issued in October 2022. The Project, as approved, involves over a thousand acres of timber cutting with chainsaws to thin the forests in and around remote giant sequoia groves and over 20,000 acres of manager-ignited fires and associated activity. Much of the tree cutting and burning would occur within designated Wilderness areas, and the project activity would span an indefinite, at least years-long time period.

3. The Project is styled as an imperative effort to "minimize the likelihood" of giant sequoia mortality due to severe wildfires. But NPS's authorization suffers serious legal flaws due to its procedural posture in approving the project, the temporal and geographic scope of the work, and the extent of activity in designated Wilderness. In brief, the agency has foregone legally required public process and evaded important statutory restrictions that apply to its actions, and the agency has improperly raised the banner of "emergency" to circumvent legal compliance.

4. A multi-year project spanning tens of thousands of acres of intensive landscape reconfiguration cannot properly be characterized as limited to the direct, immediate impacts of an emergency and thus cannot fall within the narrow regulatory frame through which NPS's purported "alternative arrangements" for environmental compliance could apply.

5. Furthermore, NPS's plans to use chainsaws and helicopters and other associated equipment to cut down trees and conduct extensive burning across thousands of acres of designated Wilderness illustrate the agency's fundamental disregard for the important strictures of Wilderness protection under federal law. The fuzzy concepts of "fuels reduction" and forest "treatment" have for decades masked extensive and impactful commercial timber activity—particularly across the non-Wilderness portions of the National Forest system. Statutory

Wilderness designation provides the utmost security for environmentally protected areas, mandating a hands-off approach that lets nature call the shots and leaves Wilderness areas "untrammeled." NPS's cavalier approach of importing into Wilderness management the agency's penchant for hands-on ecological manipulation and landscape-scale forest "treatment" exemplifies an administrative posture threatening the security of the entire National Wilderness Preservation System.

6. NPS's approval of the Project undermines important, legally required processes for public engagement and the analysis of environmental effects. And NPS's approval of the Project contravenes the statutory direction for management of much of the Project area as designated Wilderness, which precludes such extensive efforts to reengineer the natural landscape and cut trees and prohibits the motorized means with which NPS plans to carry out the Project.

**JURISDICTION AND VENUE**

7. This Court has jurisdiction over this action pursuant to 28 U.S.C. § 1331 (federal question), 5 U.S.C. §§ 701 et seq. (Administrative Procedure Act) and 28 U.S.C. §§ 2201 and 2202 (Declaratory Judgment Act). Plaintiffs have exhausted all administrative remedies, and the violations of law claimed below are ripe for judicial review.

8. Venue lies in the Eastern District of California, pursuant to 28 U.S.C. § 1391(e), because the property and events giving rise to this suit occur in this District and because two of the Plaintiffs, Sequoia ForestKeeper and Tule River Conservancy reside within the District.

9. An actual judiciable controversy exists between the parties hereto.

**INTRADISTRICT VENUE**

10. Similarly, because a substantial part of the events or omissions which give rise to the claims herein—the Project—occurred in Fresno and Tulare Counties, assignment to the Fresno Division of this Court is proper under Civil Local Rule 120(d).

**PARTIES**

11. Plaintiff WILDERNESS WATCH is a national, non-profit conservation organization whose mission is the preservation and proper stewardship of lands and rivers in the

National Wilderness Preservation System and the National Wild and Scenic Rivers System. To that end, since 1989, Wilderness Watch has engaged in public policy advocacy, congressional and agency oversight, public education, and litigation to promote sound stewardship of federal Wilderness areas and Wild and Scenic River corridors. Wilderness Watch is headquartered in Missoula, Montana.

12. Plaintiff SEQUOIA FORESTKEEPER is a non-profit corporation headquartered in Kernville, California. Its mission is to protect and restore the ecosystems of the Southern Sierra Nevada, including, but not limited to, the Sequoia and Kings Canyon National Parks, Giant Sequoia National Monument, Sequoia National Forest, and Mountain Home State Forest through monitoring, enforcement, education, and litigation. Sequoia ForestKeeper's members, many of whom reside in local areas including Kern, Tulare, Fresno, and Kings Counties, and others who visit from across the country, use and continue to use the national forests and parks of the Southern Sierra Nevada for activities such as hiking, bird and animal watching, aesthetic enjoyment, quiet contemplation, fishing, scientific study, and to improve their health, including the exact tracts of the lands and waters encompassing NPS's Project area. Many of its members also have been actively involved in formulating management policies for public lands and preserving local areas. These members' interests will be irreparably harmed by the Project, as they will no longer be able to scientifically study these areas in their unmanipulated state, take nature photographs of the area in its natural state without intensive thinning and burning management activity, or enjoy the aesthetic beauty of the natural forest habitat and its inhabitants.

13. Plaintiff TULE RIVER CONSERVANCY (TRC) is a nonprofit corporation organized under the laws of the State of California whose mission it is to protect the forests of the southern Sierra Nevada and their numerous groves of giant sequoia by advocating for their best and most responsible management. Many of TRC's members reside and/or recreate throughout these forests. For over three decades TRC has studied and commented on a wide variety of proposals and management activities proposed and/or implemented by the many agencies that manage the Sequoia National Forest and Giant Sequoia National Monument,

Sequoia and Kings Canyon National Parks, and Mountain Home State Forest. TRC's activities include alerting and educating the public about projects and proposals so they can provide input to these agencies. TRC was founded in 1991 and is based in Porterville, California.

14. This suit is brought by Plaintiff organizations on behalf of themselves and their adversely affected members and staff. Plaintiffs and their members' present and future interests in and use of the Project area are and will be directly and adversely affected by the agency's impending actions.

15. Plaintiffs' staff, members, and supporters have longstanding interests in preserving the wilderness character of federally designated Wilderness in the Sierra Nevada, including in the Wildernesses of Sequoia and Kings Canyon National Parks. Members of these organizations value Wilderness and have interests in protecting Wilderness whether or not they ever set foot inside its boundaries. They value Wilderness for its own sake, for the sake of wildlife who find increasingly scarce refuge there, and for the sake of current and future generations who rely on the preservation of Wilderness for a multitude of personal, spiritual, societal, and ecological reasons. Plaintiffs' staff, members, and supporters also visit the Wilderness areas of Sequoia and Kings Canyon for wilderness-based recreational pursuits such as hiking, summer and winter camping, backpacking, snowshoeing, backcountry skiing, wildlife viewing, and aesthetic enjoyment. They seek out the Wildernesses for these activities because of their incomparably remote, quiet, and untrammeled qualities and the opportunities for exceptional solitude and reflection that Wilderness provides. They also work in fields like tourism, research, and academia that depend upon wilderness character and minimally disturbed ecosystems; and they depend upon the integrity of the Wildernesses' wildlife, expansive and unfragmented natural landscapes, and the immeasurable environmental benefits that stem from leaving these areas as unmolested by people as possible and as minimally disturbed as the law requires.

16. Within the Project area, Plaintiffs and their staff, members and supporters have a long history of seeking out and enjoying Wilderness groves of giant sequoia trees and enjoying the ecology of the landscape in its untrammeled state. The legal violations alleged in this

complaint cause direct injury to the aesthetic, conservation, recreational, scientific, educational, wildlife and wilderness preservation interests of Plaintiffs and their staff, members, and supporters by intruding upon the natural systems in the Sequoia and Kings Canyon National Park Wilderness areas with human activity to intervene in the ecosystem and the habitat there. The intensive motorized tree-cutting activity and expansive use of manager-ignited fire and associated activities of the Project will disturb the peace and quiet and the solitude of the Wilderness as well as permanently impair its natural, undisturbed quality. In addition to injury to the immediate experience of wilderness character through the direct human activity on the landscape, Plaintiffs' staff, members, and supporters will be injured by the presence of this ecological trammeling by NPS administrators, which will permanently supplant natural, unconstrained ecological processes with outcome-driven environmental conditions shaped directly by human hands, the antithesis of the purpose of Wilderness designation.

17. Outside of designated Wilderness, Plaintiffs and their staff, members and supporters are familiar with and have an appreciation for viewing groves of famously large giant sequoias near human development, where federal land managers manicure features to facilitate heavy human visitation and manipulate the forests surrounding those groves to preserve desired conditions and insulate certain trees from ecological mortality risks. But the legal interest that Plaintiffs and their staff, members and supporters have in the protected Wilderness areas of Sequoia and Kings Canyon National Parks is that of seeing the ecosystems—and their giant sequoias—in these designated Wilderness areas respond to natural forces and experience ecological changes, forest succession and other processes that shape forests *without* being coerced by human hands. There, the manicuring influence of the human landscaper can only harm the wild ecological integrity of the forests and the sequoia groves within them. NPS's museum-diorama approach of coercing environmental conditions injures Plaintiffs' legal interest, under the Wilderness Act, in having the landscape protected from human activity so that Plaintiffs' staff, members, and supporters may observe, learn from, and appreciate ecological changes (including sequoia mortality and forest succession) as dictated only by the wild landscape itself.

18. Plaintiffs and their members and staff also have an interest in ensuring that NPS complies with all applicable laws, regulations, and procedures pertaining to the management of National Park lands.

19. The National Park Service's implementation of the "Fuels Reduction Project" is in contravention of the National Environmental Policy Act (NEPA) and the Wilderness Act. Because Defendant's actions approving the Project violate the law, a favorable decision by this Court will redress the actual and imminent injuries to Plaintiffs. If NPS were to comply with NEPA, it would prepare an Environmental Impact Statement (EIS) to consider the significant effects from the Project, given the significant effects on Sequoia and Kings Canyon National Parks' Wildernesses, *before* acting on the landscape. The analysis would consider additional alternatives to proposed actions that could minimize or avert the harm to Plaintiffs' members that will be caused from the cutting and burning of trees, the use of motorized equipment and transport, and the destruction of wildlife habitat by the proposed actions. If NPS were to comply with the Wilderness Act, it must ultimately reject intensive landscape-scale ecological manipulations, such as cutting trees with chainsaws and burning across thousands of acres, that directly contravene the legal strictures of Wilderness designation under Act, which would avoid harm to Plaintiffs' legal interests in the protection of these areas as Wilderness.

20. Defendant NATIONAL PARK SERVICE is a federal government agency within the Department of Interior, which holds the Sequoia and Kings Canyon National Parks and its Wilderness in trust for the American people and is responsible for actions in the Sequoia Grove Wilderness Thinning and Burning Project area.

**LEGAL FRAMEWORK**

<u>The National Environmental Policy Act and Implementing Regulations</u>

21. The National Environmental Policy Act (NEPA) is the nation's basic charter for protection of the environment. *See* 40 C.F.R. § 1500.1(a). NEPA's twin aims are (1) to foster informed decision-making by requiring agencies to consider the environmental impacts of their proposed actions and (2) to ensure that agencies inform the public that they considered environmental concerns. 42 U.S.C. § 4331; 40 C.F.R. § 1500.1. To accomplish these goals,

federal agencies must prepare an Environmental Impact Statement (EIS) to consider the effects of each "major Federal action[] significantly affecting the quality of the human environment." 42 U.S.C. § 4332(2)(C). An EIS must, among other things, rigorously explore a range of alternative actions and assess site-specific, direct, indirect, and cumulative impacts. 42 U.S.C. § 4332(2)(c)(iii); 40 C.F.R. §§ 1502.4, 1502.16, 1508.1.

22. To determine whether and to what extent a federal action requires NEPA compliance such as the preparation of an EIS, agencies must engage with NEPA early in decision-making processes and "identify environmental effects and values in adequate detail" to aid informed decision-making. 40 C.F.R. § 1501.2(b)(2). Agencies must consider both the short- and long-term effects of contemplated actions and whether any effects would violate federal laws protecting the environment. 40 C.F.R. § 1501.3(b)(2). In determining whether an EIS is warranted, agencies may first prepare an Environmental Assessment (EA). 40 C.F.R. §§ 1501.5, 1502.1.

23. Prior to completion of NEPA analyses, agencies may not take actions that would have adverse environmental impacts or limit the choice of reasonable alternatives available for analysis and consideration. 40 C.F.R. § 1506.1.

24. In cases of emergency, regulations promulgated by the Council on Environmental Quality (CEQ) permit agencies to seek, following required consultation with CEQ, alternative arrangements for compliance with regulatory provisions governing NEPA compliance processes. Any actions subject to such alternative arrangements must be limited to those "necessary to control the immediate impacts of the emergency." 40 U.S.C. § 1506.12. "Other actions remain subject to NEPA review." *Id.*

25. Regulations specific to NPS allow agency officials to take "actions necessary to control the immediate impacts" of an emergency and require such actions to be documented in writing along with a determination that an emergency exists along with detail about the actions taken at the time the emergency exists. 43 C.F.R. § 46.150(a)-(b). Actions taken beyond those constrained to "immediate impacts" continue to require the preparation of an EA or EIS. 43 C.F.R. § 46.150(c). NPS officials may consult with officials at the department's Office of

Environmental Policy and Compliance to get approval to complete EA work while actions following immediate emergency response actions are ongoing. *Id.* However, if actions beyond those constrained to the immediate impacts of an emergency are likely to have significant environmental effects, necessitating an EIS, consultation with CEQ is required for any alternative arrangements regarding regulatory compliance. 43 C.F.R. § 46.150(d). Alternative arrangements provided by CEQ are limited to actions "necessary to control the immediate impacts of the emergency." *Id.* Other proposed actions with significant environmental effects going beyond such immediate emergency response remain subject to full NEPA regulatory compliance. *Id.*

<u>The Wilderness Act and Acts Establishing Wilderness Designation within the Project Area</u>

26. The Wilderness Act of 1964 established the National Wilderness Preservation System and imposed legal requirements for federal administration of lands designated as Wilderness. Pub. L. 88-577, 78 Stat. 893-96 (Sept. 3, 1964); 16 U.S.C. § 1131 *et seq*. The Wilderness Act has an "explicit statutory purpose 'to assure that an increasing population, accompanied by expanding settlement and growing mechanization, does not occupy and modify all areas within the United States and its possessions, leaving no lands designated for preservation and protection in their natural condition.'" *Wilderness Soc'y v. U.S. Fish & Wildlife Serv.*, 353 F.3d 1051, 1055 (9th Cir. 2003) (en banc) (quoting 16 U.S.C. § 1131(a)).

27. The Wilderness Act defines "wilderness" as "an area where the earth and its community of life are untrammeled by man," as "retaining its primeval character and influence," and as "protected and managed so as to preserve its natural conditions." 16 U.S.C. § 1131(c).

28. Although the Wilderness Act recognizes that conservation-related activities can sometimes be appropriate within wilderness areas, see 16 U.S.C. § 1133(b), the statute places paramount its mandate of wilderness preservation, requiring that all activities in designated Wilderness be conducted in a manner that "preserv[es] . . . wilderness character" and "will leave [designated wilderness areas] unimpaired for future use and enjoyment as wilderness." 16 U.S.C. § 1131(a). Congress expressly prohibited certain activities in designated Wilderness that are defined by the Act to be antithetical to wilderness character preservation. The statute dictates that

"there shall be no temporary road, no use of motor vehicles, motorized equipment or motorboats, no landing of aircraft, no other form of mechanical transport, and no structure or installation" within Wilderness areas. 16 U.S.C. § 1133(c). The only exception that this provision affords is for activities that are "necessary to meet minimum requirements for the administration of the area for the purpose of [the Wilderness Act]." *Id.*

29. The Wilderness Act imposes a legal duty on federal lands agencies that administer designated Wilderness to "preserv[e] the wilderness character of the area." In a designated Wilderness area that may also have "other purposes for which it may have been established," the Wilderness Act expressly requires that administration for those purposes be conducted "as also to preserve its wilderness character." 16 U.S.C. § 1133(b).

30. With passage of the California Wilderness Act of 1984, Pub. L. 98-425, 98 Stat. 1627 (Sept. 28, 1984), Congress designated over 736,000 acres of Sequoia and Kings Canyon National Parks as Wilderness, to be administered under the provisions of the Wilderness Act. In 2009, Congress designated an additional over 39,000 acres within Sequoia and Kings Canyon National Parks as Wilderness, known as the John Krebs Wilderness. Pub L. 111-11, 123 Stat. 1608-09 (Mar. 30, 2009).

31. NPS's "Fuels Reduction Project" encompasses extensive areas within the Parks' designated Wildernesses.

<u>The Administrative Procedure Act</u>

32. The Administrative Procedure Act (APA), 5 U.S.C. §§ 553-559 and §§ 704-706, governs the decision-making, public process, and final actions taken by federal agencies. The APA establishes a right in members of the public harmed by federal agency decisions to redress unlawful actions; the statute authorizes courts to "hold unlawful and set aside agency action, findings, and conclusions found to be [] arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law." 5 U.S.C. § 706(2)(A). Compliance with the APA hinges on an agency's well-reasoned decision-making and its consideration of all relevant factors (including statutory requirements). *Motor Vehicle Mfrs. Ass'n of U.S., Inc. v. State Farm Mut. Auto Ins.*, 463 U.S. 29, 43 (1983); *FCC v. Prometheus Radio Project*, 141 S. Ct. 1150, 1158 (2021).

**FACTS**

33. The "Fuels Reduction Project" is located entirely within Sequoia and Kings Canyon National Parks, which NPS administers as a single unit.

34. About 39% of the total range for the giant sequoia, a species of conifer, sits within Sequoia and Kings Canyon National Parks.

35. Over 90% of Sequoia and Kings Canyon National Parks is statutorily designated Wilderness.

36. The 10% of the Parks that is non-Wilderness contains about 35% of the Parks' area of giant sequoia groves. The designated Wilderness within the Parks contains about 65% of the giant sequoia grove area.

37. Large-scale wildfires are a natural occurrence in these parks.

38. But NPS has asserted that about 80% of its giant sequoia groves do not reflect the agency's "desired fire return interval."

39. In 2003, citing the influence of past practices of fire suppression on forest conditions, NPS issued a Fire and Fuels Management Plan to mitigate threats to humans and property "while at the same time restoring and/or maintaining [wildfire's] function as a natural process."

40. The Fire and Fuels Management Plan incorporates the use of manager-ignited fire and the cutting of trees with chainsaws to manipulate forest conditions in the pursuit of anticipated fire severity reduction.

41. "Prescribed fires," according to the plan, are fires "ignited by management to achieve resource objectives."

42. Also referred to as "thinning," "mechanical fuel reduction," according to the plan, is "the use of mechanical equipment (i.e. weed whackers, chainsaws, dozers, rubber tired skidders, chippers, etc.) to cut and remove, or prepare for burning, woody fuels."

43. However, the Fire and Fuels Management Plan did not incorporate the practice of mechanical fuel reduction in designated Wilderness (where motorized equipment use and

intensive management to coerce natural ecosystem processes are statutorily prohibited with only narrow exceptions).

44. NPS acknowledged this Wilderness Act constraint in the Environmental Assessment (EA) that the agency prepared for its NEPA compliance prior to approval of the Fire and Fuels Management Plan. The EA documented that an alternative incorporating mechanical fuels treatment in Wilderness was considered but rejected. Wilderness designation, the agency wrote, "is a primary constraint on mechanical fuel reduction, limiting its application to [the non-Wilderness portions of the parks]."

45. Additionally, "serious questions remain," the agency wrote, "as to whether the outcomes of large-scale mechanical fuel treatments could produce ecological effects that sufficiently mimicked the effects of fire[.]"

46. As NPS wrote in the Fire and Fuels Management Plan, considering Wilderness designation, "[m]echanical techniques to reduce fuel load prior to prescribed burning is therefore limited by law and administrative policy to only the park developed areas. Mechanical fuel reduction is limited to areas immediately adjacent to developments in order to provide protection of structures or infrastructure from unwanted, damaging fire events."

47. Indeed, the "mechanical fuel reduction" practice of cutting down trees with chainsaws is plainly the sort of activity that is only lawfully permissible in more developed locations and is not appropriate for remote natural areas protected as designated Wilderness.

48. In the context of federal lands management nationwide, the "fuel reduction" label often serves as a euphemism for the facilitation of projects carried out by commercial timber operators.[1]

---

[1] For example, in a March 2020 letter that hundreds of concerned scientists sent to members of Congress, they summarized the issue as follows: "In countless public communications, and at numerous Congressional hearings, industry representatives have advocated for increased logging in the context of reducing wildland fire and related emissions. While small-tree thinning can reduce fire intensity when coupled with burning of slash debris under very limited conditions, recent evidence shows intensive forest management characterized by young trees and homogenized fuels burn at higher severity. Further, the extremely low probability (less than 1%) of thinned sites encountering a fire where thinning has occurred limits the effectiveness of such activities to forested areas near homes. Troublingly, to make thinning operations economically

49. But despite the legal prohibitions acknowledged in its own prior planning documents, NPS's October 2022 decision memorandum authorized motorized tree cutting on 879 acres of designated Wilderness anyways, in addition to 20,592 acres of manager-ignited fire and associated activities.

50. Upon information and belief, NPS's approval of the "Fuels Reduction Project" in Sequoia and Kings Canyon National Parks represents the first time any federal agency has authorized this amount of tree cutting with chainsaws inside designated Wilderness.

51. Throughout the National Wilderness Preservation System, the environmentally damaging ramifications of NPS opening the door to such activity are dire.

52. The predicate for the 2022 decision was NPS's fears about giant sequoia mortality from wildfires. Fires that burned in the several years leading up to 2022 resulted in greater sequoia mortality than has been previously documented.

53. In its 2022 decision memorandum, NPS identified eleven groves of giant sequoias in and around which the agency planned to implement tree cutting and fire ignitions to modify conditions to change the predicted risk of wildfire impacts.

54. Those eleven groves comprise about 23% of the giant sequoia acreage within the Parks.

55. All or part of eight of the eleven groves lie within designated Wilderness.

56. NPS's October 2022 approval of the "Fuels Reduction Project" suffered an important procedural flaw. In addition to contravening the Wilderness Act, as acknowledged in the Fire and Fuels Management Plan (and contravening the Plan itself), NPS approved the project without complying with NEPA.

57. Instead, the agency framed approval of the Project as "emergency activities" and as "requesting alternative arrangements" for NEPA compliance.

58. But the actions described in NPS's October 2022 Decision memo were not limited to those taken in the "immediate" wake of a discrete emergency. Instead, the Project is framed in

---

attractive to logging companies, commercial logging of larger, more fire-resistant trees often occurs across large areas." (*Internal citations omitted*).

the Memo as "proposed," i.e., prospective, action to pursue extensive "fuels reduction" activities—in anticipation of hypothetical future "emergencies"—over an indefinite period of years. Dependent on site and weather delays, on entire seasons such as winter, on contractor coordination, on endangered species impact mitigation, on summer park visitation, and on other factors, NPS described in the Memo that it would "opportunistically" implement the project over an indefinite period of time between approval and the completion of proper plan revision processes that would more fully analyze alternatives and substantiate NEPA and Wilderness Act compliance for similar work.

59. In other words, NPS's Project approval is not constrained to actions taken for the "immediate impacts" of any discrete emergency; this framing only served to justify bypassing NEPA and other legal constraints so that the agency could approve extensive and long-term proposed actions beyond what could be supported by the existing legal predicates applying to the agency's administration of the Project area.

60. NPS provided no public scoping notice and sought no public input in the preparation of the Project and the October 2022 Decision Memo. Plaintiffs only became aware of the Project after the National Park Service issued a Press Release and posted their signed Decision Memorandum on their website on October 14, 2022. Upon information and belief, operations to fell trees with chainsaws began within Sequoia and Kings Canyon National Park Wildernesses on the next day, on October 15, 2022, and are ongoing.

**FIRST CLAIM FOR RELIEF**

**National Environmental Policy Act (NEPA) Violations**

61. The paragraphs above are incorporated herein by reference.

62. Under NEPA, NPS must prepare an Environmental Impact Statement fully analyzing the consequences of any project that would have a significant effect on the environment. 42 U.S.C. § 4332(2)(C).

63. Federal regulations implementing processes for NEPA compliance allow, in narrow circumstances, NPS to seek alternative arrangements for the preparation of an Environmental Assessment for actions that do not have significant environmental effects. These

regulations create only a narrow exception to full regulatory compliance for limited actions taken as "necessary to control the immediate impacts" of an emergency. 40 U.S.C. § 1506.12; 43 C.F.R. § 46.150.

64. NPS's October 2022 Decision Memorandum authorizing the Sequoia Grove Wilderness Thinning and Burning Project contravened NEPA and its implementing regulations.

65. NPS authorized extensive and long-term actions that go far beyond the "immediate impacts" of any emergency. Tens of thousands of acres of prescribed burning and over a thousand acres of mechanical thinning over an indefinite period of years, subject to subsequent on-the-ground and site-specific planning processes, cannot properly be characterized as encompassing the "immediate impacts" of a discrete emergency. By circumventing its NEPA obligations under the guise of "emergency action," NPS denied the public adequate notice and the necessary environmental analysis and assessment of alternatives required by statute.

66. Furthermore, even under NPS's purported "emergency" posture, federal regulations still require the preparation of at least an Environmental Assessment for all actions beyond those so "immediate" to a bona fide emergency that such compliance is impossible. 43 C.F.R. § 46.150(b). NPS has not prepared an Environmental Assessment or adequately analyzed alternatives for the Project and instead authorized the extensive and long-term work it encompasses with only the October 2022 Decision Memorandum.

67. NPS also improperly determined that the Project would not have significant environmental effects. An Environmental Impact Statement is required when a federal action would have significant environmental effects, regardless of the project's motivation or perceived environmental benefit.

68. As NPS's own handbook guiding its NEPA compliance processes makes clear, among other things, actions that rise to significance requiring an EIS include those rooted in scientific uncertainty, those with uncertain or unknown risks, those that may establish a precedent for future environmentally impactful work, those that may adversely affect a threatened or endangered species, and those that threaten a violation of federal law. NPS's "Fuels Reduction Project" meets numerous of these factors. Among other things, for example, the

Decision Memorandum itself notes likely impacts and perfunctorily contemplates efforts to mitigate impacts on the endangered Southern Sierra Nevada Fisher; landscape-scale ecological interventions are inherently uncertain; there is critical scientific debate about the assumptions and effects inherent in such intensive "fuels reduction" practices; such extensive prescribed burning and thinning sets a precedent for future similar action in Wilderness; and the Project activity runs afoul of federal statutory directives in the Wilderness Act.

69. Furthermore, even under NPS's purported "emergency" posture, consultation with CEQ is required to secure any alternative regulatory arrangements for all actions with significant environmental effects taken both "immediate" to and beyond the immediacy of an emergency. 43 C.F.R. § 46.150(d). NPS did not consult with CEQ in authorizing the Project.

70. By its violations of NEPA, Defendant's action is arbitrary, capricious, or otherwise not in accordance with law, or without observance of procedure required by law, within the meaning of the Administrative Procedure Act. 5 U.S.C. § 706(2). As such, the Court should hold Defendant's actions as unlawful and set them aside. *Id.*

**SECOND CLAIM FOR RELIEF**

**Wilderness Act Violations**

71. The paragraphs above are incorporated herein by reference.

72. The Wilderness Act charges NPS with a duty to preserve the wilderness character of the designated Wilderness areas in Sequoia and Kings Canyon National Parks. 16 U.S.C. § 1133(b). The Wilderness Act defines Wilderness "in contrast with those areas where man and his own works dominate the landscape," as "an area where the earth and its community of life are untrammeled by man," as "retaining its primeval character and influence," and as "protected and managed so as to preserve its natural conditions." 16 U.S.C. § 1131(c). Among its provisions to further the protection of wilderness character, the Wilderness Act expressly prohibits the use of motor vehicles, motorized equipment, the landing of aircraft, and mechanical transport, "except as necessary to meet minimum requirements for the administration of the area" as Wilderness. 16 U.S.C. § 1133(c).

73. NPS's authorization of the Project includes the authorization of extensive use of motorized and mechanical equipment and aircraft landings within the Parks' Wildernesses to carry out tree cutting on 879 acres with chainsaws and other equipment and to implement over twenty thousand acres of fire activity. As NPS acknowledged in its preparation of its current Fire and Fuels Management Plan, such activity is inconsistent with the statutory directives of the Wilderness Act.

74. NPS's approval of tens of thousands of acres of activity to reengineer the natural landscape into reflecting the wildfire fuel conditions most desired by managers also undermines the goals of the Wilderness Act. The Wilderness Act expressly requires NPS to administer these areas in an "untrammeled" state reflecting the free flow of natural processes, their "primeval character and influence," to minimize the "imprint of man's work." 16 U.S.C. § 1131(c). NPS directly contravened this mandate through its approval of landscape-scale human intervention in the quick pursuit of more desirable forest conditions to reduce the risk of unwanted natural wildfire effects.

75. By its violations of the Wilderness Act, Defendant's action is arbitrary, capricious, or otherwise not in accordance with law, within the meaning of the Administrative Procedure Act. 5 U.S.C. § 706(2). As such, the Court should hold Defendant's actions as unlawful and set them aside. *Id.*

**REQUEST FOR RELIEF**

For these reasons, Plaintiffs requests that the Court:

a) Declare that NPS's "Fuels Reduction Project" violates NEPA and the Wilderness Act;

b) Set aside the Project decision memorandum;

c) Issue injunctive relief prohibiting Defendant from implementing the Project unless and until such time as the agency can demonstrate compliance with the requirements of NEPA and the Wilderness Act;

d) Prior to any future action toward work as contemplated in the Project, compel Defendant to prepare an EIS, consider and prepare alternatives to the proposed action, and otherwise to comply with NEPA before proceeding with any such actions;

e) Award Plaintiffs their costs of litigation, including reasonable attorneys' fees under the Equal Access to Justice Act, 28 U.S.C. § 2412; and

f) Provide such other relief as the Court deems just and proper.

Respectfully submitted this 25th day of September, 2023.

René Voss
Andrew Hursh, *Applicant Pro Hac Vice*

*Attorneys for Plaintiffs*